## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SASHA RODRIGUEZ and CATHELYN GREGOIRE on behalf of all persons similarly situated | ) ) ) ) |
|  | ) |
| Plaintiffs, | ) |
| vs. | ) |
|  | ) |
| SALLIE MAE, INCORPORATED and SLM, CORPORATION | ) ) |
|  | ) |
| Defendants. | ) |

CASE NO:  3:07-cv-01866 (WWE)

**CLASS ACTION**
**JURY TRIAL DEMANDED**

**November 25, 2009**

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs bring this action both individually, and on behalf of the class of persons defined below, against Sallie Mae Incorporated and SLM Corporation and their agents (hereinafter referred to collectively as "Sallie Mae") and pursuant to their investigation, upon knowledge as to themselves and their own acts and otherwise upon information and belief.

## INTRODUCTION

Through this case, Plaintiffs on behalf of themselves and those similarly situated, by and through their undersigned attorneys, against Sallie Mae Incorporated and SLM Corporation (Sallie Mae) and their affiliated entities, demand remediation of Sallie Mae's systemic discriminatory practices in the underwriting of private student loans.  Plaintiffs allege that through its company-wide discriminatory policy Sallie Mae intentionally violated civil rights laws and the Equal Credit Opportunity Act (ECOA), in the origination or underwriting of private student loans with the goal of increasing its earnings at the expense of minorities.  Plaintiffs also allege that Sallie Mae deceptively concealed its discriminatory underwriting practices from

minority students in order to continue its exploitation of minority applicants.  Sallie Mae's practices have resulted in minority applicants being charged disproportionately higher interest rates and fees than those charged to similarly situated non-minority applicants.  Sallie Mae intentionally discriminated against minority applicants by using specific criteria in its underwriting of private student loans, including consideration of the school a student attends and the student's credit history or the credit history of the student's cosigner.  As a result of Sallie Mae's discrimination, Plaintiffs and Class Members faced barriers blocking them from equal access to favorable terms on private student loans.   In addition, through its concealed relationships with colleges having high minority populations and its discriminatory underwriting policies and practices, Sallie Mae steered Plaintiffs into substandard private student loans because of their race.

Students face a number of challenges in obtaining a higher education degree.  Minority students often encounter even greater challenges than Caucasian students as they are more frequently the first in their family to attend college or their families are less likely than Caucasian families to have the money to pay for their college education.  In its 2006 10-K report, Sallie Mae recognized the dilemma students face in paying for higher education by stating: "Private Education Loans will continue to be an important driver of future earnings growth as the demand for post-secondary education grows and costs increase much faster than increases in federal loan limits."  Sallie Mae Corporation 10-K Report at 57.  Unfortunately for minority students, Sallie Mae has capitalized on the minority student's plight to maximize the profits available from this "important driver of future earnings growth" by intentionally discriminating against minority applicants in its underwriting of unfair and predatory private student loans.  Sallie Mae targeted and exploited young, unsophisticated minority students by taking wrongful advantage of a

situation created by socioeconomic forces tainted by racial discrimination.   By exploiting Plaintiffs' and Class Members' great need for education financing, Sallie Mae caused minority applicants to receive private student loans with terms less favorable than those given to similarly situated Caucasians.

## NATURE OF THE CASE

1.      This is a class action seeking redress for a common nationwide policy of racial discrimination by Sallie Mae relating to the underwriting of private student loans.   Through its nationwide scheme, Sallie Mae steered minorities toward, and subjected them to, unfavorable private loan terms, intending to deny minorities the opportunity to obtain more favorable loans based on their race.   As a consequence, Sallie Mae has disadvantaged scores of minorities seeking the same private student loans as those offered to Caucasians.

2.      "Minority" and "Minorities" as used in this Complaint refer to Hispanic and African American individuals.

3.      The term "underwriting" as used herein shall refer to Sallie Mae's conduct in underwriting loans that it originates as well as loans in which it influenced or controlled the underwriting even if it did not originate the loan.

4.      As used in this Complaint, the terms "loans" or "student loans" refers to all private student loans of which Sallie Mae influenced or controlled the underwriting.  Such loans include loans funded by Sallie Mae or any of its affiliated entities as well as loans funded by an entity other than Sallie Mae if Sallie Mae influenced or controlled the loan's underwriting.  Such loans include all loans Sallie Mae took part in underwriting on a racially discriminatory basis including loans made to actively enrolled students as well as consolidation loans which are loans from a single lender which are used to pay off the balances of several student loans. The loans

discussed herein also include Sallie Mae's "Preferred Channel Originations," which are comprised of 1) student loans that are originated on other platforms by various lenders with forward purchase commitment agreements with Sallie Mae and are committed for sale to Sallie Mae, such that Sallie Mae either owns them from inception or, in most cases, acquires them soon after origination, and 2) loans that are originated by internally marketed Sallie Mae brands. Loans obtained via the "Preferred Channel Origination" are Sallie Mae's most valuable loans because they cost the least to acquire and remain in its portfolio the longest. For example, Sallie Mae had a renewable, multi-year agreement purchasing a large share of Bank One's volume as well as purchasing all loans originated by JP Morgan Chase. Using such lenders, including among others, Stillwater National Bank and Sioux Falls National Bank, Sallie Mae was able to charge disproportionately higher interest rates than it otherwise would be allowed to charge due to the states these banks are located in. Some of Sallie Mae's agreements with lender banks enabled Sallie Mae to purchase all loans originated by the lender bank under the Sallie Mae platform, while other agreements limited Sallie Mae to exclusively market loans under a particular lender bank's names. In all of these situations, Sallie Mae influenced, directed, or controlled the underwriting of the loans.

5.     This action is brought by Plaintiffs as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of minority persons, including Hispanics and African Americans, hereinafter referred to as the "Class" or "Class Members",  who have or have had a private student loan underwritten by Sallie Mae or one of its agents in accordance with the common course of discriminatory and deceptive conduct described herein.

6.     Plaintiffs seek injunctive, declaratory, and equitable relief, including rescission, and other remedies for Sallie Mae's racially discriminatory, deceptive and unlawful conduct.

## JURISDICTION AND VENUE

7.     The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4) for violations 15 U.S.C. § 1691(a)(1), 15 U.S.C. 42 U.S.C. §1981, and 42 U.S.C. §1982.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Sallie Mae or its affiliates conduct business within the state and in this District.  In addition, certain of the named plaintiffs reside in this District and a substantial number of the events that gave rise to Plaintiffs' claims took place in this District.

## THE PARTIES

9.     Plaintiff Sasha Rodriguez is a Hispanic woman and is a resident of Branford, Connecticut who was steered towards a private student loan by Sallie Mae on which she was charged disproportionately higher rates and fees than those charged to similarly situated Caucasians.  Ms. Rodriguez's loan contains an unreasonably high interest rate and additional fees which to this day Ms. Rodriguez does not believe have been adequately and fully disclosed to her.

10.     Plaintiff Cathelyn Gregoire is an African American woman and is a resident of Gibsonton, Florida who was steered towards a private student loan by Sallie Mae on which she was charged disproportionately higher rates and fees than those charged to similarly situated Caucasians.  Ms. Gregoire's loan contains an unreasonably high interest rate and additional fees which to this day Ms. Gregoire does not believe have been adequately and fully disclosed to her.

11.     Sallie Mae Inc. is a corporation incorporated and existing under the laws of the State of Delaware and is located in Reston, Virginia.   Sallie Mae Inc. is a wholly owned subsidiary of SLM Corporation, a Delaware corporation with principal place of business being Reston, Virginia.   SLM Corporation is the parent company of a number of college savings, education lending, debt collection, and other subsidiaries.   Sallie Mae controls the underwriting practices and policies of all of its subsidiaries.   Among these are: Salle Mae Education Trust; Nellie Mae Corporation; Student Loan Funding Resources; Academic Management Services Corporation; Southwest Student Services Corporation; Student Loan Finance Association; Sallie Mae Bank; SLM Financial Corporation; Salle Mae Home Loans; SLM Education Credit Finance Corporation; SLM Funding, L.L.C.; Sallie Mae Servicing; Student Assistance Corporation; Pioneer Credit Recovery, Inc.; General Revenue Corporation; Arrow Financial Services (AFS); GRP Financial Services (GRP) Financial Services Corporation; General Revenue Corporation (GRC); Noel-Levitz, Inc.; Salle Mae Business Office Suite; Collegeanswer.com; Southwest Student Services Corporation; Academic Management Services (AMS); and Hemar Insurance Company.

12.     Sallie Mae, along with other Sallie Mae subsidiaries and affiliates, has acted in concert in carrying out the discriminatory conduct alleged herein.

**SALLIE MAE'S DISCRIMINATORY, DECEPTIVE, AND OTHER WRONGFUL ACTS**

*Violations of Civil Rights Laws and the Equal Credit Opportunity Act*

13.     For many years, Sallie Mae knowingly and intentionally, and as a matter of corporate practice and/or common course of conduct, engaged in racially discriminatory practices involving the underwriting, pricing, formation, administration and renewal of private

student loans in order to increase its own revenues and profitability to the detriment of Plaintiffs and Class Members.

14.     At all material times, Sallie Mae acted with a discriminatory intent and was motivated by racial animus.  Sallie Mae knew that the loans it was offering Plaintiffs and Class Members were predatory and discriminatory yet it intentionally targeted its high cost student loans to minorities.  Further, at all material times, Sallie Mae acted in a manner that resulted in a disparate impact upon, and the disparate treatment of, non-Caucasians.  Sallie Mae continues to discriminate against Plaintiffs and Class Members as alleged below.  Sallie Mae's discriminatory conduct includes, *inter alia*, causing non-Caucasians, including Plaintiffs and Class Members, to be charged disproportionately higher interest rates and fees on private student loans than those charged to similarly situated Caucasians.

15.     Sallie Mae foists its loans upon students, knowing that a disparate impact or the disparate treatment of minority applicants will result.  Often, Sallie Mae works in concert with schools, resulting in the schools' funneling students into Sallie Mae underwritten loans.  Generally, the student has no knowledge of certain financial arrangements that possibly exist between the school and Sallie Mae.  Many schools' documents represent to students that in order for the student to be approved for admission or in order for the school to help the student achieve his or her financial goals, the student must seek financial aid through Sallie Mae.  Sallie Mae provides incentives to these schools for these practices which result in lucrative rewards for Sallie Mae.

16.     Sallie Mae has used and continues to use an automated underwriting system to aid in determining the rates and fees charged on a particular loan.  Sallie Mae's automated underwriting system is a two step process.  First, Sallie Mae determines the rates and fees

*available* to a particular student based on the school the student attends.  Second, Sallie Mae considers a student's credit history, or in some instances, the credit history of the student's cosigner to determine the exact rates and fees that will be charged within the ranges available at the student's particular school.

17.     Because Sallie Mae uses the school a student attends to determine the rates and fees *available* to a student, often a student attending a school with a high minority population does not have the same rates and fees available to him or her as those available to a similarly situated Caucasian attending a school with a lower minority population.

18.     Sallie Mae uses these factors to assess "financial stability" for use in underwriting decisions.  The use of these factors in underwriting decisions is used to target minorities and exploit their need for education financing.  Sallie Mae's lending of these unfair and predatory loans is done for racially discriminatory purposes.

19.     Through the use of a credit scoring algorithm and a system which considers the school attended by the student, Sallie Mae intentionally designed unfair and predatory underwriting practices that discriminated against minority borrowers and which have resulted in a disparate impact on, and the disparate treatment of, minorities who borrowed private student loans underwritten by Sallie Mae.

20.     In its underwriting process, Sallie Mae considers the federal cohort default rate ("cohort rate") of each applicant's school.  The cohort rate is released yearly and adjusts according to the percentage of a school's borrowers who default on certain federal student loans during a particular federal fiscal year.

21.     The higher a school's cohort rate, the more likely the student is to receive disproportionately higher interest rates as well as add-on fees charged to the private student loan

applicant.  The additional fees charged on the loan often include a "prepaid finance" charge, "disbursement" fee, "repayment" fee, insurance premium, or "supplemental" fee.  Sallie Mae intentionally and creatively fails to adequately disclose these fees to applicants.

22.     Sallie Mae knows that a disproportionate number of schools with high minority populations have higher cohort rates than compared with the cohort rates of schools without high minority populations.  Using the school a student attends as a factor in underwriting often results in minority students being charged an unjustified interest rate and/or fees simply because of the school the student attends.  Despite this knowledge, Sallie Mae continues to use this factor in underwriting its loans.

23.     Plaintiffs believe that Sallie Mae may considers additional factors related to the student's school in underwriting private student loans that are discriminatory in nature; however, because Sallie Mae conceals its discriminatory practices, Plaintiffs cannot be sure of every way in which Sallie Mae discriminates against minorities in underwriting private student loans.  Such other discriminatory practices may include taking into account the geographic location of a particular school.

24.     Sallie Mae's automated underwriting process involves the use of a credit score produced by formulas created by Sallie Mae.  Sallie Mae conceals from applicants the actuarial basis for its automated underwriting process.  In addition, Sallie Mae keeps secret its credit scoring formulas, including the credit factors which impact the resulting score.  As a result, the amount a borrower pays for a loan is dependent upon a hidden automated underwriting process allegedly justified by actuarial information not given to borrowers.

25.     In reality, Sallie Mae's use of credit history in underwriting private student loans is also done for racially discriminatory reasons.  Sallie Mae incorporates credit in underwriting

for the purpose of using it as a pretext to give minority borrowers more onerous loan terms than those given to similarly situated Caucasians.  Furthermore, Sallie Mae's automated credit scoring program has an adverse impact on minorities.  As reflected in a number of studies, minorities as a group have lower credit scores than Caucasians.  The effect of Sallie Mae's credit scoring system is that minorities are charged higher rates and fees than similarly situated Caucasians.

26.     Sallie Mae has achieved its discriminatory goal of charging minorities more for the lending of less desirable loans through use of the artifices described above by systematically and routinely charging minority student borrowers more for private student loans due to aspects of the particular school they attend and due to information obtained in their credit history or their cosigner's history.

27.     Plaintiffs and Class Members have lost and face losing millions of dollars in interest and fees overcharged due to Sallie Mae's racial discrimination and concealment of loan terms.

28.     Sallie Mae has received millions of dollars in interest and fees by virtue of its discriminatory, fraudulent, deceptive, concealing, and overreaching policy pricing and administration practices.

29.     The interest rates, fees, and other important loan terms on Sallie Mae underwritten private student loans are racially discriminatory, excessive, unfair, unconscionable, unlawful and unreasonable and were designed to, and have, yielded a rate of return on these loan products for Sallie Mae which is excessive and unreasonable.

## ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

30.     Sallie Mae's intentional discriminatory practices, and their effects, continue even to this day.  Plaintiffs and Class Members did not know and could not reasonably have known

that they would be charged disproportionately higher rates and fees on private student loans than similarly situated Caucasians.

31.     Sallie Mae's discriminatory scheme was, by design and in practice, inherently self-concealing.  Sallie Mae knew that Plaintiffs and Class Members could not determine the relationship between the cost and benefit of the loans it was underwriting relative to the types of loan terms available to non-Caucasians.  Sallie Mae targeted a disadvantaged segment of the population that was unsophisticated about loan matters and ill equipped to understand the unfamiliar and technical language of loan documents as well as the complex methods of determining loan rates and fees.  Sallie Mae knew that the rates and fees charged to non-Caucasians, unbeknownst to non-Caucasians, were disproportionately more expensive than Sallie Mae's rates and fees charged to Caucasians.  Sallie Mae also knew that its practices resulted in a disparate impact on, or the disparate treatment of, minorities applying for private student loans.  Often, Plaintiffs and Class Members were not even aware that Sallie Mae influenced or controlled the underwriting of their loans and thus could not have discovered its discriminatory practices.

32.     Sallie Mae intentionally continues to discriminate and knowingly conceal its racially discriminatory practices.  Sallie Mae has actively and fraudulently concealed its discriminatory practices by several methods to ensure that its discriminatory practices are not discovered.

33.     At no time did Sallie Mae train or encourage its agents to explain the different treatment between non-Caucasians and Caucasians to Plaintiffs or Class Members or to notify its non-Caucasian policyholders that they were paying disproportionately higher rates and fees for inferior loans than similarly situated Caucasians.

34.     Plaintiffs and Class Members were unable to determine from the face of their loans that the loans uniformly bore disproportionately higher interest rates and fees because of their race.  The interest rates, fees, and other important loan terms for Sallie Mae underwritten private student loans have been determined based on a number of undisclosed factors that varied between student borrowers and which were not fully revealed to student borrowers or its agents. Thus, even if Class Members had attempted to inquire about their rates, they could not have discovered Sallie Mae's unfair and illegal practices.  In fact, Sallie Mae encouraged its agents to confuse borrowers when inquiries were made.

35.     Sallie Mae systematically and uniformly trained its sales force not to disclose the existence of discriminatory rates, fees, and underwriting criteria.  Sallie Mae never disclosed its discriminatory practices in any of the materials it provided to Plaintiffs or the Class.  Sallie Mae never disclosed to Plaintiffs or Class Members that the rates and fees offered to Caucasians were disproportionately lower than the rates and fees offered to non-Caucasians.

36.     Sallie Mae is in possession of its actuarial and rate information concerning these loans, and Sallie Mae considers this information highly confidential and does not and did not disclose this information to Plaintiffs or Class Members.

37.     As a result of the foregoing, Plaintiffs and Class Members in the exercise of due diligence could not have reasonably discovered the discriminatory loan terms and other deceptive and discriminatory practices and did not do so until just recently.  For the reasons alleged above, the members of the Class still do not know that they have been and continue to be injured by Sallie Mae's discriminatory conduct.

38.     Sallie Mae's discriminatory conduct is continuing in nature, and Sallie Mae has committed discriminatory acts throughout the limitations period.

39.     There is a substantial nexus between the acts of discrimination occurring within the limitation periods prior to filing suit and the acts of discrimination before that time.  The acts involve the same type of discrimination and are recurring, not isolated, events.

40.     Sallie Mae has actively concealed its discriminatory and other wrongful conduct in order to prevent, and indeed has succeeded in preventing, Plaintiffs and Class Members from discovering its racially discriminatory underwriting and fraudulent misconduct.  Sallie Mae specifically misled Plaintiffs and Class Members into believing that the terms of its private student loans were fair, reasonable, and the same as offered to Caucasian borrowers, and took steps to conceal its fraudulent and unfair conduct.

41.     The statute of limitations applicable to any claims which Plaintiffs or other Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of Sallie Mae's fraudulent concealment.  In addition, Plaintiffs and the Class did not and could not have discovered their causes of action until recently, thereby tolling any applicable statute of limitations.  Sallie Mae, through various devices of concealment and secrecy described above, affirmatively and fraudulently concealed the existence of its unlawful and discriminatory scheme and course of conduct from Plaintiffs and Class Members.  Plaintiffs and Class Members had no knowledge of Sallie Mae's scheme and unlawful conduct and did not learn of or discover Sallie Mae's fraudulent course of conduct until the filing of this action.

42.     Plaintiffs regularly and continuously attempted to discover all of the relevant terms and conditions of their loans by reviewing the loan documents they received, communicating with their respective schools and with Sallie Mae via email, telephone and the loan management website.

43. Plaintiffs' inability to determine the terms of their student loans were blocked by extraordinary circumstances out of their control, such as Defendants' training of employees to withhold clear disclosure of loan terms. For example, customer service representatives were specifically instructed not to disclose the terms of students' loans if students inquired. If students pressed for information on their interest rates, customer service representatives were instructed to provide information in a manner that would confuse borrowers, such as providing a margin for the loan in question rather than an interest rate.

44. Because Sallie Mae actively conceals certain loan terms such as supplemental fees and insurance premiums, students have no reason to suspect that Sallie Mae has imposed such undisclosed loan terms on them. Therefore, Plaintiffs' due diligence in staying informed about their loans and loan terms was futile for purposes of revealing undisclosed terms like the supplemental fees. To this day, Sallie Mae has not disclosed the explanation of the supplemental fees, including insurance premiums, on Plaintiffs loans.

## PLAINTIFFS' ALLEGATIONS

### Plaintiff Sasha Rodriguez

45. Plaintiff Sasha Rodriguez is a Hispanic woman who lives at 20 Sunset Hill Drive, Branford, Connecticut 06405 and is a member of the class alleged herein. Plaintiff Sasha Rodriguez lived in Gilford, Connecticut in 2003 when she applied to attend McIntosh College in New Hampshire. Sallie Mae private student loan applications were mailed to Rodriguez's home in Connecticut, where she signed the documents and mailed them back to Sallie Mae. Subsequently, Rodriguez moved to New Hampshire to attend McIntosh College.

46. Prior to moving to New Hampshire, Rodriguez was persuaded by a school representative to apply for specific loans so that she could attend McIntosh College. In order to

obtain her Associates of Science degree over the course of 18 months, Rodriguez was coerced into taking $19,500.00 in private student loans, underwritten by Sallie Mae, as well as approximately $12,000.00 in federal student loans from Nelnet.

47.     Sasha Rodriguez's loans were borrowed on the understanding that the loan terms offered were fair and reasonable.  Sallie Mae never disclosed or otherwise informed Ms. Rodriguez that she was charged disproportionately higher rates and fees on these loans based on her race through Sallie Mae's discriminatory underwriting.

48.     As of December 2007, Ms. Rodriguez had two private Signature Student Loans with 18.125% interest rates, both underwritten by Sallie Mae.  Between October 2003 and March 2005, Ms. Rodriguez borrowed a total of $19,500.00 in private student loans to fund her education and her loans went into repayment status as of September 2005.  Ms. Rodriguez also believes that she was charged a supplemental fee of some sort, yet this information has still not been disclosed to her.  As a result of Sallie Mae's discriminatory underwriting, as of November 1, 2007, Sasha Rodriguez's private student loan debt had risen from $18,900.00 to over $33,000.00.  Sasha Rodriguez's monthly Sallie Mae bill as of December 2007, which did not even dent her principal balance, was in excess of $500.00.

49.     At the time Sasha Rodriguez took out the private student loans, an explanation of the rates and fees were not revealed to her by her lender, her loan servicer, or her school.  In fact, only upon graduation did Rodriguez realize that her interest rates were over double the amount she was initially led to believe they would be.

50.     Sasha Rodriguez repeatedly attempted to contact Sallie Mae via telephone, email and Sallie Mae's loan management website. She was and is still unable to access her loan information via the "Manage My Loans" website.   When Rodriguez was given loan

documentation, it was incomplete, inaccurate or unclear. The rates being charged on Rodriguez's private student loans as of December 2007 conflicted with rates reflected on past statements she received from Sallie Mae. Sallie Mae's fees are so well hidden that Plaintiff still does not have full knowledge as to the exact amount she was charged, despite her frequent requests for such information.

51.     Sasha Rodriguez repeatedly attempted to contact McIntosh College for more information regarding her financial aid awards. The college representatives were unable or unwilling to provide complete disclosures of the loan terms, including interest rates and fees, and guided Rodriguez back to Sallie Mae for any further information.

52.     Sasha Rodriguez discussed the Sallie Mae loans with several former McIntosh College students. All of the students expressed equal frustration with the changing interest rates, rapidly increasing loan balances and lack of information about their loans. Rodriguez determined that she had the same amount of information as the other similarly-situated students, so she had no reason to suspect that she was entitled to more disclosures than she had already received.

53.     Sasha Rodriguez attended an "exit interview" at her school at which time the school informed Ms. Rodriguez that it did not have even have her student loan documents on file.

54.     As of December 2007, Sasha Rodriguez made $10.40 per hour as a manager at a Rite Aid pharmacy. Due to the unreasonably high interest rates, fees charged, and payments due on her private student loans, Rodriguez cannot afford to make payments as Sallie Mae demands. As a result of her being unable to make her payments Sallie Mae has harassed Ms. Rodriguez, calling her up to 17 times per day and constantly e-mailing her as well. Sallie Mae has gone so

far as to humiliate Ms. Rodriguez by repeatedly calling her work and even calling her landlord. Ms. Rodriguez has given Sallie Mae verbal and written instruction to cease and desist contacting her, her place of business, and her landlord, yet Sallie Mae has disregarded these requests.

55.     Sasha Rodriguez's private student loan interest rates and fees were calculated in part on aspects of the school she attended and using her credit history, which resulted in her being given an unfair and predatory loan.

56.     Sallie Mae engaged in discrimination both as a result of racial animus and in order to profit at the expense of the non-Caucasian community.

57.     As a result of Sallie Mae's racially discriminatory practices alleged above, interest rates and fees on Sasha Rodriguez's private student loans are disproportionately higher than rates and fees charged to similarly situated Caucasian private student loan borrowers.

58.     Because Sallie Mae fraudulently concealed its discriminatory and other wrongful conduct, Sasha Rodriguez could not have known: (i) that she was charged disproportionately higher rates and fees because of her race or (ii) that she was not offered better, more favorable and affordable loan terms because of her race.

**Plaintiff Cathelyn Gregoire**

59.     Plaintiff Cathelyn Gregoire is an African American woman who lives in Tampa, Florida and is a member of the class alleged herein.  Ms. Gregoire attended the International Academy of Design and Technology (hereafter "Academy of Design" in Tampa, Florida beginning in July 2003, a school with a very close and cooperative relationship with Sallie Mae which works to the financial benefit of both organizations.  On information and belief Sallie Mae and the Academy of Design coordinate the financial aid process including what information will be disclosed to students during the process and the timing of such disclosures.

17

60.    Cathelyn Gregoire's family did not have the means to fully pay for her college education.  In 2003, prior to beginning classes, Ms. Gregoire was given financial aid documents by the Academy of Design, which she was instructed to sign and return in order to get financial aid. Ms. Gregoire executed the necessary loan documents at the financial aid office of the "Academy of Design". As a result, an application for a Sallie Mae Signature Loan was processed on her behalf.   Ms. Gregoire was led to believe by the financial aid office that she had received all of the documents relevant to her loan terms when she executed the loan documents.

61.    In approximately May or June 2003, Ms. Gregoire began the loan application process. Ms. Gregoire was permitted to begin classes at the Academy of Design in July 2003 even though a loan had not yet been approved. Thereafter, in approximately September 2003, almost three months after Ms. Gregoire had begun classes; Sallie Mae approved a $14,276.00 CEC Signature Loan and disbursed the funds to the school.

62.    Sometime in late 2003, Ms. Gregoire learned that the course credits she earned from the Academy of Design were not transferable to any universities.  As a result Ms. Gregoire left the school.

63.    Cathelyn Gregoire attempted at every appropriate time to discover all of the relevant terms and conditions of her loans.  She executed the loan documents in person at the financial aid office, asked questions concerning the loan terms, and reviewed the documents she was provided before and after signing them.  She was led to believe that she was provided all of the documents relevant to her loan terms at that time.  She communicated at appropriate and regular times with her school and Sallie Mae via email.  She regularly logged onto the loan management website, and at no time were all of the fees and other charges disclosed to her, nor was it ever disclosed to her that she would need to go digging in undisclosed locations to be able

to discover the loan terms Sallie Mae would ultimately impose on her.  In fact, because of Sallie Mae's active concealment of fees and other charges, Ms. Gregoire had no reason to suspect that Sallie Mae had imposed undisclosed loan terms on her.  Her due diligence in staying informed concerning her loan and its terms was futile for purposes of revealing the fees and other charges because to this day Sallie Mae has not disclosed the imposition of these fees and charges on her loans.

64.    Because of the delayed repayment period, Sallie Mae's disclosure practices and Sallie Mae's close cooperative relationship with the Academy of Design, Cathelyn Gregoire could not and did not discover the loan terms Sallie Mae would ultimately impose on her within a year after the loan transactions were consummated.  Despite her due diligence Cathelyn Gregoire was unaware that she was entitled to more complete and thorough disclosure of the loan terms.

65.    Since 2004, Sallie Mae has continued to conceal information on the private student loans from Ms. Gregoire as Sallie Mae did not send her regular statements and at times blocked her from logging in to the Sallie Mae website to view the status of her loans.

66.    Sallie Mae took part in underwriting Ms. Gregoire's student loans through both a credit scoring and judgmental credit review system.

67.    Since leaving the International Academy of Design and Technology, Ms. Gregoire obtained her Associates of Arts degree from Tallahassee Community College.  She works full-time and attends the University of South Florida.

68.    As of December 2007, Ms. Gregoire had approximately $20,000.00 in Sallie Mae underwritten private student loans.  To her knowledge, Sallie Mae was requesting approximately $800.00 per month in payments, which she simply could not afford.

69.     Ms. Gregoire was charged a discriminatory interest rate and additional fees on her private student loans.

70.     Cathelyn Gregoire's unreasonably high loan payments are a result of Sallie Mae's discriminatory underwriting practices and were carried out by Sallie Mae's concealment of its discriminatory underwriting practices and concealment of the loan terms from Ms. Gregoire.

71.     In underwriting Ms. Gregoire's private student loans, Sallie Mae engaged in discrimination both as a result of racial animus and in order to profit at the expense of the non-Caucasian community.

72.     As a result of Sallie Mae's racially discriminatory practices alleged above, Ms. Gregoire was charged disproportionately higher rates and fees on her private student loans than those charged to similarly situated private student loan applicants of other races.

73.     Because Sallie Mae fraudulently concealed its discriminatory and other wrongful conduct, Ms. Gregoire could not have known: (i) that she was charged disproportionately higher rates and fees because of her race or (ii) that she was not offered better, more favorable and affordable loan terms because of her race.

## CLASS ACTION ALLEGATIONS

74.     This case is brought as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure because Sallie Mae has acted or refused to act on grounds generally applicable to the Class through Sallie Mae's company-wide underwriting policies as generally applied to all minority applicants.  In addition, Plaintiffs seek certification of a Rule 23(b)(3) punitive damage class.  Plaintiffs seek certification of this action as a class action on behalf of the Class defined above.

75.     This action is appropriate as a class action pursuant to Rule 23.  Sallie Mae has engaged in a common course of racially discriminatory conduct in the formation, servicing, and underwriting of the private student loans lent to Plaintiffs and Class Members.  Furthermore, the issue of liability is common to the class as it rests upon a company-wide policy of underwriting private student loans.  Plaintiffs' claims can be readily tested through generalized proof applicable to the class as a whole.

76.     Membership in the Class is so numerous that separate joinder of each member is impracticable.  The number of Class Members is unknown but can be readily determined from the records of Sallie Mae.  Plaintiffs reasonably estimate that there are hundreds of thousands of persons in the Class.  Although Plaintiffs do not presently know the names of all Class Members, the Class is ascertainable and the identities and addresses can be obtained from Sallie Mae's records.

77.     Plaintiffs are members of the Class of victims described herein.  They were subjected to Sallie Mae's fraudulent and discriminatory scheme and common course of conduct, resulting in loans being based on their race which were discriminatory, excessive, unfair, unconscionable, unlawful, and unreasonable.

78.     There are numerous and substantial questions of law and fact common to all Class Members which control this litigation and which predominate over any individual issues.  Included within the common questions are:

a.      Whether Sallie Mae discriminated against Plaintiffs and Class Members by charging them disproportionately higher interest rates and fees on private student loans than those charged to similarly situated Caucasians depending on the school Plaintiffs and Class Members attended;

b.      Whether Sallie Mae discriminated against Plaintiffs and Class Members by charging them disproportionately higher rates and fees than those charged to similarly situated Caucasians depending on Plaintiffs' and Class Members' credit history or their cosigners' credit history;

c.      Whether Sallie Mae's intent in its discriminatory policies and practices were racially motivated;

d.      Whether Sallie Mae maintained a corporate policy to extend private student loans on a racially discriminatory basis by concealing material information from Plaintiffs and Class Members such as the fact that the loans were not extended under the same terms and conditions as those offered to similarly situated Caucasians;

e.      Whether Sallie Mae trained, directed or determined that its agents conceal or not disclose Sallie Mae's discriminatory lending practices;

f.      Whether Sallie Mae devised and deployed a scheme or common course of conduct which acted to defraud or deceive Plaintiffs and Class Members and/or exacted unreasonable, unconscionable and/or discriminatory rates and fees on private student loans by taking advantage of its position of superior knowledge;

g.      Whether Sallie Mae systematically failed to disclose to Plaintiffs and Class Members material information such as the actual basis on which loan terms would be determined;

h.      Whether Sallie Mae systematically discriminated against Class Members and engaged in a deceptive scheme and common course of conduct in

targeting an economically disadvantaged segment of the population for the lending of private student loans;

i.      Whether Sallie Mae knew or should have known that its underwriting practices were discriminatory in violation of the Equal Credit Opportunity Act;

j.      Whether Plaintiffs and Class Members are entitled to specific performance, injunctive relief and/or other equitable relief against Sallie Mae;

k.      Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Sallie Mae; and

l.      Whether Plaintiffs and Class Members have sustained damages and the proper measure of those damages.

79.     The claims of Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interests which are adverse to those of the Class.  Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in the prosecution of insurance class actions and similar types of complex litigation.

80.     Plaintiffs seek preliminary and permanent injunctive and equitable relief and punitive damages on behalf of the entire Class because Sallie Mae has acted or refused to act on grounds generally applicable to the entire Class.

81.     Certification of a punitive damage Class pursuant to Rule 23(b)(3) meets the superiority and manageability tests required under the Rules of Civil Procedure.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Class Members will continue to suffer

damage, and Sallie Mae's violations of laws will proceed without remedy while Sallie Mae continues to retain the proceeds of its ill-gotten gains.

83.     Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation, the size and scope of Sallie Mae's uniform lending scheme, the significant costs attendant to litigation on this scale, and the comparatively small, although still significant, damages suffered by individual Class Members. Given the likelihood that Class Members are of limited financial means, it is unlikely that any individual plaintiff could afford to pursue this type of suit on his or her own.

84.     This action will result in an orderly and expeditious administration of Class claims.  Economies of time, effort and expense will be fostered and uniformity of decisions will be ensured.

85.     This action presents no difficulty that would impede its management by the Court as a class action, and a class action is superior to other available methods for the fair and efficient adjudication of their claims.

86.     In additional to actual monetary damages, Plaintiffs' injury in fact is the denial of equal treatment resulting from the imposition of the barrier Sallie Mae has created via its discriminatory underwriting.  As a whole, Sallie Mae's practices limited Plaintiffs' choices in comparison to the choices available to similarly situated Caucasians.

## COUNT I

### RACIAL DISCRIMINATION
### 42 U.S.C. § 1981

87.     Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 86 above as if fully set forth herein.

88.     Sallie Mae intentionally discriminated against Plaintiffs and Class Members by underwriting loans in a discriminatory manner, resulting in Plaintiffs and Class Members being charged disproportionately higher interest rates and fees than those charged to similarly situated Caucasian private student loan borrowers as set out above.  Sallie Mae intended to deprive Plaintiffs and Class members of the opportunity to borrow loans with more favorable terms based on their race.

89.     By charging Plaintiffs and Class Members disproportionately higher interest rates and fees than those charged to similarly situated Caucasians, Sallie Mae unlawfully discriminated against Plaintiffs and Class Members in (i) formation of contracts; (ii) making, performance, modification, and termination of contracts; (iii) the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship; and/or (iv) conduct that interferes with the right to establish and enforce contract obligations.  Furthermore, Sallie Mae targeted Plaintiffs and Class Members with these predatory loans in violation of 42 U.S.C. § 1981.

90.     Sallie Mae's actions violate 42 U.S.C. §1981, as well as the rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth Amendments to the Constitution of the United States.

91.     Sallie Mae has damaged Plaintiffs and Class Members because Plaintiffs and the Class have suffered economic loss as a result of Sallie Mae's illegal racial discrimination.

92.     At no time has Sallie Mae undertaken corrective action to ameliorate its racially discriminatory practices now embedded in the private student loans underwritten by Sallie Mae and taken by Plaintiffs and Class Members.  Sallie Mae continues to reap the profits of its discriminatory practices and continues to discriminate against minority applicants.

93.     Sallie Mae's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous or otherwise aggravated beyond mere negligence.  As a result, Plaintiffs and Class members are entitled to punitive damages in additional to monetary, injunctive, and other equitable relief.

## COUNT II

### RACIAL DISCRIMINATION
### 42 U.S.C. § 1982

94.     Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 86 above as if fully set forth herein.

95.     A private student loan is personal property within the meaning of 42 U.S.C. § 1982.

96.     Sallie Mae has discriminated against Plaintiffs and the Class with respect to the private student loans they borrowed.  Plaintiffs and the Class have not had the same right as Caucasians to inherit, purchase, and hold the loans underwritten by Sallie Mae.  Sallie Mae has, as a result, violated 42 U.S.C. § 1982.

97.     Sallie Mae intended to deprive Plaintiffs and Class Members of the opportunity to take out loans with more favorable terms because of their race.  Sallie Mae's violation of 42 U.S.C. § 1982 was intentional and malicious and motivated by racial animus.

98.     Plaintiffs and the Class held private student loans within the time period allowed under Plaintiffs' claims. As a proximate result of Sallie Mae's violation of 42 U.S.C. § 1982, Plaintiffs have been damaged.   In addition, Sallie Mae's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous or otherwise aggravated beyond mere negligence.  As a result, Plaintiffs and Class members are entitled to punitive damages in additional to monetary, injunctive, and other equitable relief.

## COUNT III

### EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 1691, *et. seq.*

99.     Plaintiffs repeat, reallege, and incorporate the allegations contained in paragraphs 1 through 86 above as if fully set forth herein.  This count is brought on behalf of Plaintiffs and Class Members.

100.    Private student loans and access thereto are covered by the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 *et seq.*

101.    ECOA, 15 U.S.C. § 1691(a)(1) makes it unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction, on the basis of race.  A creditor "discriminates" against an applicant if the creditor treats an applicant less favorably than other applicants. 12 C.F.R. § 202.2.

102.    As a party which participates in the credit decision, Sallie Mae is a "creditor" under ECOA 15 U.S.C. § 1691(a)(e), 12 C.F.R. § 202.(*l*)-1, pursuant to the implementation of ECOA, Regulation B, 12 C.F.R. § 202.2(1).   As debtors or applicants, Plaintiffs and Class Members are protected under the ECOA.

103.    Plaintiffs and Class Members are "applicants" pursuant to 15 U.S.C. § 1691a(b) as they applied to Sallie Mae for an extension, renewal, or continuation of credit.

104.    Plaintiffs and Class Members are minorities who borrowed private student loans which Sallie Mae participated in underwriting and who have been charged disproportionately higher interest rates and fees than similarly situation Caucasians as a result of Sallie Mae's practices.

105.    The underwriting criteria used by Sallie Mae, including the school Plaintiffs attended and their credit history, constituted intentional discrimination and also resulted in a

disparate impact on, and the disparate treatment of, minority private student loan borrowers, including Plaintiffs and Class Members who borrowed private student loans underwritten by Sallie Mae.

106.    Sallie Mae has a non delegable duty not to discriminate on the basis of race in violation of the ECOA and other civil rights laws, which cannot be avoided by delegating aspects of the financial transaction to other parties.

107.    As result of Sallie Mae's violations of the ECOA, Plaintiffs and Class members are entitled to actual and punitive damages in addition declaratory relief, equitable relief, and costs and attorneys' fees pursuant to 15 U.S.C. § 1691e(b)-(d).

**WHEREFORE**, Plaintiffs request judgment and orders against Sallie Mae on behalf of themselves and Class Members as follows:

(1)    An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(2)    Awarding Plaintiffs and Class Members their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

(3)    Granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including rescission, reformation, attaching, impounding or imposing a constructive trust upon, or otherwise restricting, the proceeds of Sallie Mae's ill-gotten funds to ensure that Plaintiffs and Class Members have an effective remedy;

(4)    Awarding punitive damages to Plaintiffs and Class Members;

28

(5)     Granting declaratory and injunctive relief and all relief that flows from such injunctive and declaratory relief;

(6)     Appointing Plaintiffs as Class Representatives and designating the undersigned counsel as counsel for the Class; and

(7)     Granting such other and further relief as the Court deems just and proper including, but not limited to, recessionary relief and reformation.

## JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury.

Dated: November 25, 2009.

Respectfully submitted,

*s/Nicole C. Mayer*
Nicole C. Mayer
Bar No.phv02328
John A. Yanchunis
W. Christian Hoyer
Terry Smiljanich
Christopher C. Casper
Jillian L. Estes
Jonathan B. Cohen
**JAMES, HOYER, NEWCOMER
SMILJANICH & YANCHUNIS, P.A.**
4830 West Kennedy Boulevard, Suite 550
Tampa, FL  33609-2589
Tel. No. (813) 286-4100
Fax No. (813) 286-4174
nmayer@jameshoyer.com

**Attorneys for Plaintiff Sasha Rodriguez
and Co-Lead Class Counsel**

M. Hatcher Norris, Esq.
Butler, Norris & Gold
254 Prospect Avenue

Hartford, CT 06106
Tel. No. (860) 236-6951
Fax No. (860) 236-5263
Email:  rnorris@bnglaw.com
Federal Bar No. ct00061
*Local Counsel for Sasha Rodriguez*

Christa L. Collins
CHRISTA L. COLLINS, LLC
1780 102nd Ave. N., Suite 100
St. Petersburg, FL 33716
ccollins@clcfirm.com

Allen M. Stewart
Steve Baughman Jensen
James D. Piel
Allen Stewart, P.C.
325 N. Saint Paul St., Suite 2750
Dallas, TX 75201
Telephone: (214) 965-8700
Facsimile: (214) 965-8701

Gary K. Shipman
Jean S. Martin
Matt W. Buckmiller
Shipman & Wright, LLP
575 Military Cutoff Rd., Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6752

**Attorneys for Plaintiff Cathelyn Gregoire
and Co-Lead Class Counsel**

Joseph B. Burns
ROME McGUIGAN, P.C.
One State St., 13th Floor
Hartford, CT 06103
Telephone: (860) (493-3410
Facsimile: (860) 724-3921
*Local Counsel for Plaintiff Gregoire*

**ATTORNEYS FOR PLAINTIFFS**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**


| | | |
|---|---|---|
| SASHA RODRIGUEZ and CATHELYN | ) | |
| GREGOIRE on behalf of all persons | ) | CASE NO.: 3:07-cv-01866(WWE) |
| similarly situated | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CLASS ACTION |
| | ) | JURY TRIAL DEMANDED |
| SALLIE MAE, INCORPORATED and | ) | |
| SLM, CORPORATION | ) | |
| | ) | November 25, 2009 |
| Defendants. | ) | |
| _____ | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2009, the foregoing **PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT** was served by the Court's CM/ECF System and a Notice of this filing will be sent by e-mail to the attorneys listed below by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Lisa M. Simonetti                        Jennifer R. Rossi
Julia B. Strickland                       Craig A. Raabe
Mary Manesis                            Robinson & Cole, LLP
Nancy M. Lee                            280 Trumbull Street
Stroock Stroock & Lavan, LLP             Hartford, CT 06103
2029 Century Park East
Los Angeles, CA 90067


                                         *s/Nicole C. Mayer*
                                         NICOLE C. MAYER